**In re TAVERN MOTOR INN, INC.
d/b/a The Montpelier Tavern
Inn, Debtor.**

**Bankruptcy No. 83–89.**

United States Bankruptcy Court,
D. Vermont.

March 19, 1987.

See also 69 B.R. 138.

S. Knapp, Dinse, Erdmann & Clapp, Burlington, Vt., for the Chittenden Trust Co. (CTC).

A. Medor, Rutland, Vt., trustee.

P. Monte, and B. Lyford, Young, Monte & Lyford, Northfield, Vt., for Northfield Sav. Bank (NSB).

R. Obuchowski, South Royalton, Vt., for the Tavern Tenants Committee (Tenants).

J. Palmisano, Barre, Vt., pro se, trustee for the Estate of Irving and Ellen Anders (Trustee).

S. Prentice, Montpelier, Vt., for Chittenden Trust Co. (CTC).

## MEMORANDUM DECISION

FRANCIS G. CONRAD, Bankruptcy Judge.

NSB has moved under Rules of Bankruptcy Procedure, Rules 7052(b) and 9023, for this Court to alter or amend its September 29, 1986 Decision. From the bench, we ruled that NSB, by virtue of its status as an assignee of an assignment of lease and rents, which was collateral for an obligation of the debtor to NSB, was not entitled to partake of the proceeds from the pending sale of the debtor's assets. We granted the motion to reconsider and ordered the parties to submit memoranda of law. Because we find that the assignment of the lease and rents does not rise to the level of a security interest in real property, NSB is not entitled to be paid on its promissory note from the proceeds resulting from the sale of debtor's assets, and accordingly, we reaffirm our September 29, 1986 Order.

On May 11, 1983, debtor filed a voluntary petition under Chapter 11. Under Chapter 11, the fate of this historic landmark floundered for the next three years until an Order was entered on July 3, 1986, converting the debtor to a case under Chapter 7 of Title 11 of the United States Code.

The trustee acted quickly and moved under 11 U.S.C. § 363(b) to sell all the debtor's real and personal property. He obtained consents to sell the property from all the known lienholders. To NSB's surprise, the trustee did not request their consent to the proposed sale, nor was NSB listed in the motion as a known lienholder.[1]

At NSB's request, an expedited hearing for clarification of its status as a lienholder was held on September 29, 1986, the day before the public sale. We treated NSB's request as an 11 U.S.C. § 506[2] motion and ruled that NSB did not have a security interest in the real estate or the future sale proceeds. At the same hearing, on September 29, 1986, we approved the sale under 11 U.S.C. § 363(b), and Ordered the proceeds be held in escrow until such time as we determined the validity, extent, and priority of any and all liens. On November 10, 1987, we confirmed the sale of the debtor's assets to Northeast Hotel Group Inc. We now consider NSB's motion to alter or amend our September 29, 1986 Bench Decision.

On December 15, 1979, debtor, Tavern Motor Inn, Inc. (Tavern), purchased from Avery Inns of Vermont, Inc. (Avery), the Tavern Motor Inn. NSB was a lessee of Avery for a 17 year term commencing December 18, 1979 and, by virtue of Tavern's purchase, became a lessee of Tavern.

Prior to Tavern's purchase of the Tavern Motor Inn, Tavern executed a $100,000.00 promissory note to NSB. The note ex-

---

1. At no time during the pendency of the debtor's Chapter 11 case did any party in interest, including the Tavern, ever question the secured status of NSB. Disclosure Statements and Plans filed with the Court referred to NSB's claim as secured. Trustee's motion to sell was the first indication that NSB may not be secured.

2. 11 U.S.C. § 506 provides:
(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount to be setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed distribution or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.
(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.
(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—
(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or
(2) such claim is not an allowed secured claim due only to the failure of any entity to file proof of such claim under section 501 of this title.

pressed that it was secured by a collateral assignment of a lease and rents. An assignment of the lease as collateral for the promissory note was executed by Tavern as assignor and NSB as assignee. The assignment transferred Tavern's lease with NSB to NSB together with a conditional assignment of the rents, income, and profits from the use and occupation of the lease. NSB recorded the assignment with the Montpelier City Clerk and the Vermont Secretary of State in an effort to perfect its security interest.

Shortly after NSB's recording, Tavern executed a $1,800,000.00 first mortgage with CTC, and recorded it in the Montpelier City land records. CTC admits that it possessed actual knowledge of NSB's recorded assignment. In fact, CTC took an assignment of leases from Tavern which expressly excepted NSB's lease and rental assignment. Tavern also executed a second mortgage to Avery for approximately $700,000.00. From the facts before us, we don't know if Avery's mortgage was recorded, however, it is not necessary to our Decision.

To understand the legal issues, it is imperative that we examine the relevant and material language of the operative loan documents between NSB and Tavern:

### The Promissory Note

"... The indebtedness evidenced by this note is secured by a collateral assignment of lease and rents ... is dated December 15, 1980.";

### The Assignment of Lease as Collateral

"... Tavern ... hereinafter referred to as "ASSIGNOR" and the Northfield Savings Bank ... hereinafter referred to "ASSIGNEE" ... ASSIGNOR grants, transfers, and assigns to ASSIGNEE ASSIGNOR's entire interest as Lessor in a certain lease ... dated the 18th day of December, 1979, and by its terms is continual (sic) in full force and effect for a remaining period of 17 years ... ASSIGNOR further grants, transfers, and assigns to ASSIGNEE all rents, income and profits arising from such lease ...

from the use and occupation of the premises ..., and at the option of the ASSIGNEE, from all additional leases ... which may be executed in the future during the term of this assignment ... Until such time as ASSIGNOR *may default* in payment of the principal interest or other indebtedness secured by the Note ... the ASSIGNOR *may collect* all rents, income and profits arising under the lease ... and retain the same ..."; (emphasis ours).

### The Loan Agreement

"... As security for the above referenced loan, the Borrowers (Tavern) shall execute a collateral assignment of a lease and the rents it generates ... Said collateral assignment shall be perfected under the Uniform Commercial Code and also shall be filed in the Montpelier City Land Records. Upon default and without notice, the Borrowers (Tavern) agree that the Bank (NSB) pursuant to the collateral assignment of the lease and the rents it generates will pay any rents required by the above referenced lease to the Northfield Savings Bank and credit the Borrowers (Tavern) loan account, in addition to all other remedies it may have under the terms of the promissory note contemplated, the security agreement contemplated and the collateral assignment." (parentheticals supplied for clarity).

NSB readily admits that it did not seek a first mortgage of the premises because the other lenders, CTC and Avery, were not willing to subordinate their security interests. CTC concedes that its first mortgage is subordinate to NSB's lease.

NSB claims it is entitled to share in the proceeds from the real estate sale under the following alternative theories:

1. The assignment of rents and profits as security for a debt created an equitable lien in the real property of the assignor;
2. The assignment of the lease and rent constitutes a security interest in real property; and since the note secures not only the assignment of the lease,

rents, and profits for the balance of the 17 year term but also extends to the length of the debt, then NSB has a reversionary interest in real property from which it is entitled to be accorded lien status as defined in 11 USC § 101(31).[3]

Chittenden replies:

1. NSB does not have an equitable lien under circumstances where the intention of the parties was only to create a lien on the rents and profits and not the real property itself;

2. NSB's assignment of lease does not entitle it to a lien on the debtor's real property because debtor had transferred only the personal property right to receive rent upon default; the debtor's assignment of the lease and rents to NSB did not transfer the debtor's reversionary interest, but only the right to collect rent which is a mere personal property interest.

■ The nature of a creditor's real and personal property rights in bankruptcy is defined by State law, not Federal law. *In re STN Enterprises, Inc.,* 47 B.R. 315, 318 (Bkrtcy.D.Vt.1985), citing, *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979); *In re Brass Kettle Restaurant, Inc.,* 790 F.2d 574, 575 (7th Cir.1986).

The legal effect of the written instruments, *i.e.,* the assignment of lease as collateral, the promissory note, and loan agreement, is determined by the laws of contract. Where the language is clear, the intentions and understanding of the parties must be taken to be that which their agreement declares. *H.P. Hood & Sons v. Heins,* 124 Vt. 331, 336, 205 A.2d 561 (1964); *Stevens v. Cross Abbott Co.,* 129 Vt. 538, 545, 283 A.2d 249 (1971). " 'Where there is no doubt or obscurity, there is no room for construction and the instruments must be given effect according to its terms.' " *Addison County Automotive, Inc. v. Church,* 144 Vt. 553, 559, 481 A.2d 402, [quoting *Aiken v. Clark,* 117 Vt. 391, 393, 92 A.2d 620, 621 (1952) ].

The "loan agreement" unambiguously states that Tavern was to execute the "assignment of lease as collateral" as security for the loan. The collateral was to consist of the lease and rent. Upon default, Tavern agreed under the lease assignment that NSB could pay rent to itself and credit Tavern's loan obligation to it. Provided the default was not cured, NSB would be entitled to remain in possession for the balance of the leasehold term rent free or, if longer, until the loan obligation was paid.

Having described the effect of the operative documents, we proceed to address NSB's arguments.

### THE EQUITABLE MORTGAGE THEORY

NSB, as the debtor's lessee/assignee, relies on *Allen v. Gates,* 73 Vt. 222, 50 A. 1092 (1900), for the proposition that its assignment of the lease and rents created an equitable lien on Tavern's real estate. Their argument then follows: since they perfected by recording prior to the first and second mortgagees, CTC and Avery, they acquired a security interest that allows them to attach the asset sale proceeds ahead of the first and second mortgagees.

In *Allen,* the lessee leased an empty lot from the lessor for a term of 5 years. The lessee and the lessor entered into a contract whereby the lessee could construct a building, and, at the end of the rental term, the lessee could remove the building or require the lessor to purchase the building at the lessee's cost less 20%. Before the term expired, the lessor granted a mortgage to another which was ultimately assigned to a bank. The bank foreclosed and conveyed it to the plaintiff. Prior to the foreclosure, the lessee notified the lessor to buy the building, which the lessor was financially unable to do. The lessee and lessor then agreed that the lessee would collect the rent and remain in possession until the lessee-creditor had realized the

---

**3.** 11 U.S.C. § 101(31) renumbered by the 1986 Amendments to § 101(33) states: In this title— "lien" means charge against or interest in property to secure payment of a debt or performance of an obligation.

debt, *i.e.*, the cost less 20% value of the building. The lessee then conveyed his interest by warranty deed to the defendants (buyers) who were enjoined from removing the building. On appeal, the Vermont Supreme Court, after announcing that the lessee's demand upon the lessor resulted in the building becoming part of the lessor's real property, held:

It is manifest that the parties intended thereby that Whitney (lessee) should have such rents to apply towards the payment of the debt due him from Englesby (lessor) for the building; and it was, in effect, an assignment of the rents and profits to Whitney (lessee) as security for the debt, and created an equitable lien on the property in his favor, upon the maxim—Whenever persons agree concerning any particular subject, that a Court of Equity, as against the party himself, and any claiming under him voluntarily or with notice, raises a trust.

*Allen v. Gates*, 73 Vt. 222, 229, 30, 50 A. 1092 (1900), citing *inter alia, Ex Parte Wills*, 1 Ves.Jr. 162, 30 Eng.Rep. 281 (1790). (Parentheticals supplied for clarity).

The Court then went on to find the lessee's assignee (buyer) did not have the right to remove the building, since he no longer owned the building; however, the lessee's assignee did have a right to have the rents and profits applied toward the payment of the debt and remanded the case to the trial court for an accounting for the sums due the assignee.

Responding to manifest intentions of the original parties, the *Allen* Court exercised its equitable powers to prevent the lessee's successor in interest from not realizing the value of the building.

There is no other Vermont case which addresses the circumstances concerning NSB's status as an equitable mortgagee. Applying *Allen* to the instant case: neither NSB nor Tavern intended that the assignment of lease and rents would create a lien on the debtor's real estate that would be sufficient to subordinate the first and second purchase money mortgagees. The in-

tent of the parties was that NSB have adequate assurance of loan payments without restricting Tavern's obligations to the first and second mortgagees.

■ Contrary to NSB's position that the parties' intention is not relevant and that their secured position should be found as a matter of law, we find that the parties' intention is indeed relevant and material in deciding whether this court should invoke its equitable jurisdiction:

[E]quity looks at the final intent and purpose rather than at the form; and if the intent appears to give, or to charge, or to pledge property, real or personal, as a security for an obligation, and the property is so described that the principal thing intended to be given or charged can be sufficiently identified, the lien follows.

4 Pomeroy's Equity Jurisprudence, § 1237 (5th Ed.1941).

■ It has been said that an assignment of rents and profits is an odd way of conveying; but it amounts to an equitable lien; and would entitle the assignee ... (to) insist upon a mortgage. *Ex Parte Wills*, 1 Ves.Jr. 162, 30 Eng.Rep. 281 (1790). In this State, however, before an equitable lien may attach, there must be (1) a debt, duty or obligation owing by one person to another, (2) an identifiable res to which that obligation fastens, and (3) an expressed intention that the res and the parties be so bound. See *Hare v. Congregational Society*, 76 Vt. 362, 365, 57 A. 964 (1904); 4 Pomeroy's Equity Jurisprudence, §§ 1235, 1237 (5th Ed.1941); 5 Tiffany's Real Property, § 1563 (3d Ed.1939). Compare *In re Brass Kettle Restaurant, Inc.*, 790 F.2d 574 (7th Cir.1986).

While it is clear that NSB and Tavern stand in relation of obligee and obligor; that there is an identifiable res to which the obligation fastens; and that the parties intended to be bound, it is equally clear that NSB and Tavern did not intend for the assignment to "fasten" to the real estate or its proceeds, but only to the lease, rents, or profits: "The assignment of a lease for purposes of collateral security vests only a special property in the assignee, while the

general property and right to redeem remains in the assignor." *Rutland Amus. Co. v. Seward*, 127 Vt. 324, 326, 248 A.2d 731 (1968), citing, *White River Savings Bank v. Capital Savings Bank and Trust Co.*, 77 Vt. 123, 128, 59 A. 197 (1904). NSB does not have an equitable lien or mortgage on the debtor's real property or its proceeds. As the Court in *Tromblay v. Dacres*, 135 Vt. 335, 339, 376 A.2d 753 (1977) noted:

> The doctrine of equitable mortgages does apply to agreements denominated as a "contract for a deed" or, in older usage, "bond for a deed." ... Since the payments are applied to the purchase obligation as they accumulate, an equity, though perhaps small, comes into being. It is this interest that is referred to as the equitable mortgage interest that requires foreclosure ...

> To hold otherwise would render every lease containing a purchase option agreement creating an equitable mortgage situation from the time of notice of intention to exercise it ... This is not the principle behind the equitable mortgage concept. Rather, it rests on the principle of the accumulation of an equitable interest in the property that deserves recognition even without the execution of a formal mortgage instrument.

> (citations omitted).

NSB's interest does not rise to the level of interest described in *Tromblay*, Id.

## THE SECURITY INTEREST IN REAL ESTATE ARGUMENT

■ In the alternative, NSB argues that the assignment of the lease, rents, and profits created an interest in the real estate, as defined 11 U.S.C. § 101(33).[4] As we previously said, real property rights are defined by State law not Federal law. See *Butler*, supra.

1 V.S.A. § 132 defines "real estate" as: "'Land', 'lands' and 'real estate' shall include lands, tenements and hereditaments and all rights thereto and interests therein, and pews or slips in place of public worship shall be treated as real estate." Mercifully, NSB does not argue that its interest rises to the level of a pew or slip, but rather, their interest acquired from the assignment is an "hereditament." Since they recorded that interest prior to the first and second mortgagees, CTC and Avery, they must be paid not only from the proceeds but paid first after the administrative expenses. We disagree. The construction and operation of the assignment, from the language and the circumstances of this case, vested in the assignee only a special property, the general property remaining in the assignor. *Dieter v. Scott*, 110 Vt. 376, 384, 9 A.2d 95 (1939); See also, 51C C.J.S. Landlord & Tenant, § 42(c).

It is elementary property law that a landlord and a tenant possess separate and distinct estates in the demised premises. *Berlin Dev. Corp. v. Vt. Struct. Steel*, 127 Vt. 367, 371, 250 A.2d 189 (1968).

> When the owner of real property leases out his property for a term of years, he carves his prior absolute and unqualified estate into two estates, one in the lessee, the other in himself. For all intents and purposes, the tenant is the absolute owner for the term of the lease, however, the lessor still has an interest in the land. Technically this interest could be called a reversion interest.

2 Powell, The Law of Real Property, § 246[1] (1985).

NSB's argument that the "assignment of lease as collateral" not only transferred the lease and the rent, upon default, for the balance of the term, but also transferred part of the Tavern's reversionary interest, either because the amount of the debt may exceed the term or because the assignment could follow a successor lessee, is without merit.

A lessor may sever his right to collect rent to another without affecting the reversionary interest in the subject premises:

> Likewise, the lessor may by express grant transfer the rent to another while retaining the reversion in himself. Such a grant of the rent separate from the reversion will arise where the lessor as-

---

**4.** See footnote 3, supra.

signs the lease without any mention of the reversion, since, although the transfer of a reversion will carry with it the rent as an incident, the transfer of the rent cannot carry with it the reversion as an incident.

11 American Law of Property, § 9.45 (Casser Ed.1952); 49 Am.Jur.2d, Landlord and Tenant, §§ 98, 528; *Demarest v. Willard,* 8 Cowen 206, 209 (N.Y.S.Ct.1828). Nowhere in the assignment between NSB and Tavern do we find one reference to an assignment of Tavern's reversionary interest.

When Tavern executed the assignment to NSB, NSB acquired, upon default, a mere chose in action for the remaining, if any, unpaid rent, whether it arose from subsequent replacement leases or not.

The construction and circumstances surrounding the operation and intentions of the parties to this assignment reveal that NSB entered the transaction with its eyes wide open. It knew that the first and second mortgagees would not have consented or subjected their security to anything more than a simple assignment from the debtor for NSB's lease and rent.

NSB can not now be heard to complain that it can not drink from the same well as the first (CTC) or second (Avery) mortgagees.

## THE UNIFORM COMMERCIAL CODE THEORY

■ Although the parties did not expound on whether NSB's interest falls within the Uniform Commercial Code, 9A V.S.A. §§ 9–102,[5] 9–104,[6] this issue is sufficiently concrete, and not merely hypothetical, for this Court to exercise its judicial power, See *Judge v. Diamond, (In re Victor Dye Works, Inc.)* 48 B.R. 943, 946–47 (Bkrtcy.E.D.Pa.1985) and decide whether NSB is secured within the meaning of 9A V.S.A., *et seq.*

The Uniform Commercial Code question confronting us is whether an interest in real estate subsequently employed in a transaction which is intended to create a security interest, 9A V.S.A. § 1–201(37),[7]

---

5. 9A VSA § 9–102 provides:
 (1) Except as otherwise provided ... in section 9–104 on excluded transactions, this article applies so far as concerns any personal property and fixtures within the jurisdiction of this state (a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts or contract rights; and also
 (b) to any sale of accounts contract rights or chattel paper.
 (2) This Article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, consignment intended as security. This Article does not apply to statutory liens except as provided in Section 9–310.
 (3) The application of this article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this Article does not apply.
 Comment 4. An illustration of subsection (3) is as follows:
 The owner of Blackacre borrows $10,000 from his neighbor, and secures his note by a mortgage on Blackacre. This Article is not applicable to the creation of the real estate mortgage. However, when the mortgagee in turn pledges this note and mortgage to secure his own obligation to X, this Article is applicable to the security interest thus created in the note and the mortgage. Whether the transfer of the collateral for the note, i.e., the mortgagee's interest in Blackacre, requires further action (such as recording an assignment of the mortgagee's interest) is left to real estate law. See Section 9–104(j).

6. 9A V.S.A. § 9–104(j) provides: This article does not apply (j) ... to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder.
 Comment 2. ... [T]he Article applies only to security interests in personal property. The exclusion ... of leases and other interests in or liens on real estate by paragraph (j) merely reiterates the limitations on coverage already made explicit in Section 9–102(3). See Comment 4 to that section.

7. 9A V.S.A. § 1–201(37) provides, *inter alia:*
 (37) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation ... Unless a lease ... is intended as security, reservation of title thereunder is not a "security interest" ... Whether a lease is intended as security is to be determined by the facts of each case; however,
 (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and

*In re Bristol Associates, Inc.*, 505 F.2d 1056, 1058 (3rd Cir.1974) is within the ambit of 9A V.S.A. § 9, *et seq.* (Article 9). Whether a lease is intended as security is to be determined by the facts of each case. 9A V.S.A. § 1–201(37); *In re Mountain Carpet*, 11 B.R. 729 (Bkrtcy.D.Vt.1979).

The operative documents, facts, and the intention of the parties show that the parties intended the lease to be security for Tavern's loan from NSB. The security interest was to be effected by an assignment of the lease and perfected by its recording.

To understand NSB's legal interests requires an analysis of the legal relationship between NSB and Tavern. The lease between NSB and Tavern recites the relationship of lessor and lessee between the parties. The assignment of the lease as collateral creates the relationship of secured party and debtor between the parties. Under the lease, possession of the property lies with NSB, but title, or the right to the return of the property (the reversionary interest) on the termination of the lease relationship, remains in Tavern. In the case of the security interest in the lease, the interest held by NSB is the security interest in the lease, namely, to collect rents and profits in the event of default.

■ As a lessee, NSB holds an interest in real property. That interest is protected by the real property law of this State. As we have already decided, that interest does not rise to the level of a mortgage. What interest it does protect, we need not decide.[8] What is clear is that Article 9 does not apply to the lessor/lessee relationship of this proceeding. 9A V.S.A. § 9–104(j).

■ The relationship of secured party and debtor is another matter. We recognize that the cases are divided as to wheth-

er Article 9 applies to a pledge of realty paper as collateral. [See White and Summers, UCC (2d Ed.) § 22–6, n. 106 and cases cited therein.] We believe a plain reading of § 9–102, Official Comment 4 to § 9–102 of the UCC, § 9–104(j), and § 1–201(37) provides the correct view that Article 9 should apply to facets of transactions using a lease as collateral except those issues that arise when the lessor or lessee is attempting to enforce its rights under the lease. For an analogous situation, See Comment, Security Interests in Notes and Mortgages: Determining Applicable Law, 79 Col.L.Rev. 1414, 1427 (the code should apply to all facets of transactions using mortgages and notes as collateral except those issues that arise when the mortgagee's creditor is attempting to enforce the mortgage.) See also *Siltzer v. North First Bank*, 445 So.2d 649, 38 UCCRS 379 (Fla. App. 2d Dist.1984). (Where there is a secured transaction with respect to a real estate mortgage and inventory, real estate law governs the mortgage and Article 9 governs the inventory.)

Where does all this leave NSB? Exactly where they were when they entered this bankruptcy, and with the benefit of their bargain. They are secured to the extent they requested, intended, and bargained to tender onto themselves their own rent for the balance of their leasehold term or until the indebtedness under the note is met, whichever occurs later, no more and no less. Our Decision of September 29, 1986 stands without modification or alteration. Now, Therefore,

It is ORDERED that NSB is not entitled to share in the distribution of the proceeds resulting from the sale of the Tavern, and it is FURTHER ORDERED that the claim

---

(b) an agreement that upon compliance with the terms of the lease shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does not make the lease one intended for security.

8. Without deciding the real property rights of NSB, we think it is necessary to point out to NSB that the rights of a tenant in possession of real estate, under a lease given prior to the execution of a mortgage on the same premises,

are not extinguished by a foreclosure of the mortgage or a sale of the property; the purchaser acquires no greater interest than the mortgagee or landlord had, and both become the landlord of the lessee. see 55 Am.Jur.2d § 575. Compare *Pope v. Henry*, 24 Vt. 560 (1852) (a party in possession is notice to a subsequent purchaser or encumbrancer, of whatever title the one in possession may have, whether legal or equitable.)